Anni L. Foster (#023643)
General Counsel
Office of Arizona Governor Douglas A. Ducey
1700 West Washington Street
Phoenix, Arizona 85007
Telephone: 602-542-4331
E-Mail: afoster@az.gov

Brett W. Johnson (#021527)
Colin P. Ahler (#023879)
Derek C. Flint (#034392)
Ian R. Joyce (#035806)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone:  602.382.6000
Facsimile:  602.382.6070
E-Mail: bwjohnson@swlaw.com
        cahler@swlaw.com
        dflint@swlaw.com
        ijoyce@swlaw.com

*Attorneys for Plaintiff Douglas A. Ducey,*
*Governor of the State of Arizona*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas A. Ducey, Governor of the State of Arizona, in his official capacity, | No. |
| Plaintiff, | **Complaint for Declaratory and Injunctive Relief** |
| v. | |
| Janet Yellen, Secretary of the Treasury, in her official capacity; Richard K. Delmar, Acting Inspector General of the Department of Treasury, in his official capacity; and U.S. Department of the Treasury, | |
| Defendants. | |

**INTRODUCTION**

*"All legislative Powers herein granted shall be vested in a Congress of the United States…" U.S. Const. art. I, § 1.*

1. The COVID-19 pandemic has created havoc in the lives of every citizen of our nation, and its biggest impact has been on our children. The loss of learning, socialization and opportunity has set our children back years, even with the great efforts made by parents and educators.

2. This is why the State of Arizona, through the Governor's Office, implemented programs in accordance with federal law and regulations, using funds appropriated to it by Congress, to bridge the gaps, get our children back in school and get them back on track academically.

3. Yet, following implementation of these programs, Arizona has been put on notice that funding, along with the children and parents it assists, will be held hostage if Arizona fails to bend to the arbitrary and capricious authority of a federal regulatory agency.

4. Douglas A. Ducey, Governor of the State of Arizona, cannot allow this action to stand without protest. The work of mitigating COVID-19 "belongs to state and local governments across the country and the peoples elected representatives in Congress." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 2022 WL 120952, at *3 (U.S. Jan. 13, 2022) (Gorsuch, J., concurring).

5. This case arises out of the U.S. Department of the Treasury ("Treasury") seeking to usurp Congressional power in the area of COVID-19 financial relief. Through its attempted legislative action, Treasury seeks to deprive the State of Arizona of millions of dollars in aid that Congress appropriated for the purpose of mitigating the negative economic impacts of the COVID-19 pandemic—monies that are critically needed to recover from the pandemic's effects on education, including the remote learning that disproportionately impacted low-income students. If these effects are not addressed, they will have long-term economic, educational and social, consequences.

6. The genesis of the dispute is Congress's passage of the American Rescue Plan

Act of 2021 ("ARPA"). Among other things, ARPA created the Coronavirus State and Local Fiscal Recovery Fund (the "SLFRF").  In the text of ARPA, Congress specifically described the permissible uses of SLFRF monies by States and also specifically described restrictions on such uses.

7.     Initially, Treasury—which was tasked with distributing SLFRF monies and creating implementing regulations—correctly recognized that ARPA gave the States "*broad latitude* to choose whether and how to use the [SLFRF funds] to respond to and *address the negative economic impact*" of COVID-19. Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26786, 26794 (May 17, 2021) (emphasis added).  Treasury further recognized that one way for States to address the negative economic impact of COVID-19 would be through programs focused on the educational impacts of remote or hybrid learning, which disproportionately affected low-income and minority students.

8.     In accordance with Treasury's statements, as well as the text of ARPA, Governor Ducey used some of the SLFRF monies to create two grant programs that addressed the long-term, negative economic impacts on disadvantaged communities from school closures and overbearing mask mandates. The programs empower parents and students to exercise their freedom to make informed decisions regarding their health and educational needs.

9.     More recently, however, Treasury arbitrarily changed its guidance, and through a clear abuse of discretion, is seeking to unilaterally amend ARPA by adding new health conditions on how SLFRF monies may be used. In particular, and even though Treasury has no background expertise in public health, Treasury recently issued a Final Rule that purports to prohibit SLFRF monies from being used in a manner that, in the subjective and ill-informed opinion of Treasury, would undermine efforts to stop the spread of COVID-19. Based on its policy objections to the two grant programs referenced above, Treasury has also indicated to Governor Ducey that, even though this Final Rule does not become effective until April 1, 2022, the Rule somehow authorizes Treasury to: (1) recoup SLFRF monies distributed to the State; and (2) withhold future SLFRF distributions.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

10.    Treasury's actions far exceed the statutory authority granted to it under ARPA. Nothing in that underlying statute authorizes Treasury to condition the use of SLFRF monies on following measures that, in the view of Treasury, stop the spread of COVID-19. If Congress had truly intended to give Treasury the power to dictate public health edicts to the States, and recoup or withhold SLFRF monies based on an alleged lack of compliance with such edicts, it would have spoken clearly on the matter. It did not. Moreover, even if Treasury were correct that ARPA conferred it the broad authority it now claims to attach new conditions on SLFRF monies, then the statute would violate the Spending Clause of the U.S. Constitution and the non-delegation doctrine. This Court should declare the Final Rule invalid, declare that Treasury has acted arbitrarily and capriciously and has abused its discretion, and enjoin Treasury's legislative overreach.

## PARTIES, JURISDICTION AND VENUE

11.    Plaintiff Douglas A. Ducey is the Governor of the State of Arizona. Under Arizona law, Governor Ducey is the official authorized to accept and expend funds received from the federal government or any agency thereof. *See* Ariz. Rev. Stat. § 41-101.01(A). Pursuant to this authority, Governor Ducey has accepted and expended SLFRF monies. Additionally, Governor Ducey serves as the sole State official responsible for communications between the State of Arizona and the federal government. *See* Ariz. Rev. Stat. § 41-101(A)(4).

12.    Defendant Janet L. Yellen is the Secretary of the Treasury of the United States and is named in her official capacity.

13.    Defendant Richard K. Delmar is the Acting Inspector General of the Department of the Treasury and is named in his official capacity. On information and belief, the Inspector General is responsible for monitoring and oversight of COVID-19 relief funds that have been disbursed to the States, and is generally responsible for informing and advising the Secretary of the Treasury about programs administered by Treasury and the need for corrective action.

14.    Defendant the U.S. Department of the Treasury is an agency of the United

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

States. Treasury is not a public health agency and does not have expertise in this area. Rather, on its website, Treasury describes its role as follows:

> The Treasury Department is the executive agency responsible for promoting economic prosperity and ensuring the financial security of the United States. The Department is responsible for a wide range of activities such as advising the President on economic and financial issues, encouraging sustainable economic growth, and fostering improved governance in financial institutions. The Department of the Treasury operates and maintains systems that are critical to the nation's financial infrastructure, such as the production of coin and currency, the disbursement of payments to the American public, revenue collection, and the borrowing of funds necessary to run the federal government. The Department works with other federal agencies, foreign governments, and international financial institutions to encourage global economic growth, raise standards of living, and to the extent possible, predict and prevent economic and financial crises. The Treasury Department also performs a critical and far-reaching role in enhancing national security by implementing economic sanctions against foreign threats to the U.S., identifying and targeting the financial support networks of national security threats, and improving the safeguards of our financial systems.[1]

15.    This Court has jurisdiction under 28 U.S.C. §§ 1331, and 2201-02.

16.    Venue in the District of Arizona is proper under 28 U.S.C. § 1391(e) because: (1) Governor Ducey resides in this district, is the State official responsible for communications between the State of Arizona and the federal government, and this case does not involve real property; and (2) "a substantial part of the events and omissions giving rise to the claim occurred" in this district—namely, the receipt and disbursement of SLFRF monies.

## GENERAL ALLEGATIONS

### I.    The Provisions of ARPA

17.    On March 11, 2021, President Joseph Biden signed ARPA into law.

18.    Section 9901 of ARPA amends Title VI of the Social Security Act (42 U.S.C. § 801 *et seq.*) to establish the SLFRF.

19.    The SLFRF appropriates $219,800,000,000 to States, territories, and Tribal

---

[1] *Role of the Treasury*, U.S. Department of the Treasury (last visited Jan. 20, 2022), https://home.treasury.gov/about/general-information/role-of-the-treasury

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

governments "to mitigate the *fiscal* effects stemming from the public health emergency with respect to the Coronavirus Disease." 42 U.S.C. § 802(a)(1) (emphasis added).

20.   In Section 9901 of ARPA, Congress expanded on the permissible uses of SLFRF monies. 42 U.S.C. § 802(c)(1). In particular, Congress mandated in 42 U.S.C. § 802(c)(1) that the funds be used for one of four purposes:

(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

21.   In 42 U.S.C. § 802(c)(2), Congress described two restrictions on the use of SLFRF monies:

(A) IN GENERAL.—A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

(B) PENSION FUNDS. —No State or territory may use funds made available under this section for deposit into any pension fund.

22.   ARPA also provided that Treasury may provide SLFRF funds to States in separate installments with the only requirement for acceptance of each installment that the

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

State sign a certification stating that the funds will only be used for the purposes outlined in the statute. 42 U.S.C. § 802(b)(6)(A)(ii) and (d).

23.     ARPA does *not* contain any provisions that prohibits State, local, or Tribal governments from using SLRF monies on programs that according to Treasury "undermine" efforts to stop the spread of COVID-19 or that require compliance with CDC recommendations or guidance—notably such provisions would put Treasury responsible for determining public health protocols, for which it is not qualified or, more importantly, statutorily-authorized.

24.     In discussing the recoupment remedy, Congress explained that "[a]ny State, territory, or Tribal government that has failed to comply with" 42 U.S.C. § 802(c) in its use of SLRF monies "shall be required to repay to the Secretary [of the Treasury] an amount equal to the amount of funds used in violation of such subsection." 42 U.S.C. § 802(e).

25.     Congress also provided some authority to Treasury to withhold monies based on a lack of compliance with 42 U.S.C. § 802(c): "If a State or territory is required under [42 U.S.C. § 802(e)] to repay funds for failing to comply with [42 U.S.C. § 802(c)], the Secretary may reduce the amount otherwise payable to the State or territory. 42 U.S.C. § 802(b)(6)(ii)(III).

26.     Congress also gave the Secretary of the Treasury "the authority to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f).

**II.     Treasury's Interim Final Rule**

27.     On May 17, 2021, Treasury published in the Federal Register an "Interim Final Rule" implementing the SLRF. Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26786 (May 17, 2021).  A copy of the Interim Final Rule is attached as Exhibit 1.

28.     The Interim Final Rule described how a state could use SLRF in order to fall within one of the four categories of permissible uses described in 42 U.S.C. § 802(c)(1).

29.     For instance, with respect to the first category of permissible use (42 U.S.C. § 802(c)(1)(A)), the Interim Final Rule described how a program could respond to the

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

COVID-19 public health emergency *or* the negative economic impacts of the pandemic.   In fact, the Interim Final Rule addressed each of these two topics separately, under different headings—one section was titled "Responding to COVID–19," while another was titled "Responding to Negative Economic Impacts." The Interim Final Rule also explained: "While the COVID–19 public health emergency affected many aspects of American life, eligible uses under this category must be in response to the disease itself *or the harmful consequences of the economic disruptions resulting from or exacerbated by the COVID–19 public health emergency*." 86 Fed. Reg. at 26788 (emphasis added).

30.    In the section addressing "Responding to Negative Economic Impacts," the Interim Final Rule provided that "[w]here there has been a negative economic impact resulting from the public health emergency, States, local, and Tribal government *have broad latitude to choose whether and how to use the Fiscal Recovery Funds to Respond to and address the negative economic impact.*" 86 Fed. Reg. at 26794 (emphasis added).

31.    The Interim Final Rule then detailed, on several occasions, how a state could respond to negative economic impacts of COVID-19 by addressing the educational impacts of the pandemic.  For instance, the Interim Final Rule stated:

    a.    "The negative economic impacts of COVID-19 also include significant impacts to children in disproportionately affected families *and include impacts to education*, health, and welfare, all of which contribute to long-term economic outcomes." 86 Fed. Reg. at 26793 (emphasis added)*.*

    b.    "Many low-income and minority students, *who were disproportionately served by remote or hybrid education during the pandemic*, lacked the resources to participate fully in remote schooling or live in households without adults available throughout the day to assist with online coursework." *Id.* (emphasis added).

    c.    "Given these trends, *the pandemic may widen educational disparities* and worsen outcomes for low-income students, an effect that would substantially impact their long-term economic outcomes. Increased economic strain or

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

material hardship due to the pandemic could also have a long-term impact on health, educational, and economic outcomes of young children." *Id.* (emphasis added).

32.     Accordingly, the Interim Final Rule stated that SLFRF monies may be used on: "Evidence-based educational services and practices to address the academic needs of students, including tutoring, summer, afterschool, and other extended learning and enrichment programs." 86 Fed. Reg. at 26796. Other permissible uses of SLFRF monies include: "Evidence-based practices to address the social, emotional, and mental health needs of students." *Id.*

33.     Although Treasury included examples of allowable uses of SLFRF monies, it also noted that such examples were not exhaustive and provided the following guidelines for States to use to analyze whether programs complied with the statutory provisions: (1) "a recipient should first consider whether an economic harm exists;" and (2) whether use of the funds would "respond to" or address the harm. 86 Fed. Reg. at 26794.

34.     Treasury also released a "Frequently Asked Questions" guidance document about the Interim Final Rule, which similarly explained that SLFRF monies may be used to "Address[] educational disparities exacerbated by COVID-19, including: early learning services, increasing resources for high-poverty school districts, educational services like tutoring or afterschool programs, and supports for students' social, emotional, and mental health needs." [Exhibit 2, *Coronavirus State and Local Fiscal Recover Funds Interim Final Rule: Frequently Asked Questions*, U.S. Department of the Treasury, at 7-8 (Jan. 2022), https://home.treasury.gov/system/files/136/SLFRPFAQ.pdf.]

35.     The Interim Final Rule does *not* contain any provision that prohibits States from using SLFRF monies on programs that supposedly "undermine" efforts to mitigate the spread of COVID-19 or are inconsistent with any CDC guidance or recommendations relating to the spread of COVID-19.

## III.    Arizona's Use of SLFRF Monies

36.     With the Interim Final Rule in place, on May 21, 2021, Matthew Gress,

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Director of the Governor's Office of Strategic Planning and Budgeting ("OSPB"), signed a certification form issued by Treasury authorizing Treasury to make SLFRF payments to the State.

37.    Subsequent to that certification, the State received the first "tranche" of SLFRF funding.

38.    On August 17, 2021, Governor Ducey announced the Education Plus-Up Grant Program ("Plus-Up"). Plus-Up made $163 million in ARPA funds available to Arizona school districts and charter schools that received less than $1,800 per pupil under previous programs that were also intended to mitigate the economic impacts of COVID: namely, the Enrollment Stabilization Grant Program and/or the Elementary and Secondary School Emergency Relief Fund.

39.    Governor Ducey's announcement of Plus-Up explained that the program "is designed to further aid in the mitigation of the economic impacts of COVID-19 and further ensure financial stability to Arizona Local Education Agencies." *State Fiscal Recovery Fund: Education Plus-Up (EPU)*, eCivis (last visited Jan. 20, 2022), https://gn.ecivis.com/GO/gn_redir/T/1sdmeoc0bsnvo.

40.    Consistent with this purpose, Plus-Up funds must be used on expenses directly related to the mitigation of the impacts of the COVID-19 pandemic. *Id.* (under "Eligibility" tab). Expenditures not directly related to mitigating the impacts of the COVID-19 pandemic are prohibited. *Id.* (under "Eligibility" tab).

41.    To be eligible for Plus-Up grants, districts and charters may not "requir[e] the use of face coverings during instructional hours and on school property (with the exception of CDC transportation guidelines);" though schools have every ability to encourage practices recommended by the CDC and students were not prohibited from doing so. District and charters must also "remain[] open for in-person instruction as of August 27, 2021 and throughout the remainder of the school year." *Id.* (under "Eligibility" tab).

42.    Also on August 17, 2022, Governor Ducey announced the COVID-19 Educational Recovery Benefit Program ("ERB") program. The ERB program supplied $10

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

million in ARPA monies for K-12 students and families facing financial and educational barriers due to school closures and mandates.

43.     To be eligible for an ERB award, K-12 students and parents must demonstrate that: (1) their household income is at or below 350% of the Federal Poverty Level; and (2) their current school is requiring the use of face coverings during instructional hours and on school property (with the exception of CDC transportation guidelines). *Covid-19 Educational Recovery Benefit*, FACTS (last visited Jan. 20, 2022), https://online.factsmgt.com/grant-aid/inst/4NXJL/landing-page. The ERB program provides funding of up to $7,000 per student. *Id.* Among other things, ERB funds may be spent on school tuition, online tutoring, childcare, daycare fees, after-school care fees, and before-school care fees of Arizona Department of Economic Security-contracted providers. *Id.*

44.     The application materials for Plus-Up and the ERB both state: "The Arizona Office of the Governor supports and encourages schools informing educators, parents and students of the CDC recommendations regarding COVID-19 Mitigation Policies." *See Covid-19 Educational Recovery Benefit*, *supra*; *State Fiscal Recovery Fund: Education Plus-Up (EPU)*, *supra*.

45.     Plus-Up and the ERB both fall within the ARPA's authorization to use SLFRF monies to address the "negative economic impacts" of COVID-19. 42 U.S.C. § 802(c)(1).

## IV.     The Governor's Office Responds to Treasury's Concerns about Plus-Up and ERB

46.     On October 5, 2021, Treasury wrote a letter to the Governor's Office of Strategic Planning and Budgeting ("OSPB"), asserting that Plus-Up and ERB "undermine evidence-based efforts to stop the spread of COVID-19." [Exhibit 3, Oct. 5, 2021 Letter from U.S. Department of Treasury to Governor Ducey, at 1.]

47.     More specifically, Treasury took issue with the Plus-Up program stating that the program conditions SLFRF funding on "the recipient school districts not requiring the

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

use of face coverings during instructional hours and on school property." [*Id.*] Similarly, Treasury complained that the ERB program provides "up to $7,000 per student to families for tuition or other educational costs at a new school that does not require face coverings if the student's current school is requiring the use of face coverings during instructional hours and on school property."[2] [*Id.*]

48.     In the October 5 letter, Treasury, without asking for information to justify the State's program, stated that "[a] program or service that imposes conditions on participation or acceptance of the service that would undermine efforts to stop the spread of COVID-19 or discourage compliance with evidence-based solutions for stopping the spread of COVID-19 is not a permissible use of SLFRF funds." [*Id.* at 2.] However, Treasury did not cite any text from ARPA to support its contention that Plus-Up or ERB were not permissible uses of SLFRF funds.

49.     In support of its position that SLFRF funds may not be used on programs that, in Treasury's view, "discourage compliance with evidence-based solutions for stopping the spread of COVID-19," Treasury instead cited to pages 26786 and 26790 of the Interim Final Rule. But this language is not found on page 26786 or page 26790. *See* 86 Fed. Reg. 26786, 26790. Indeed, nothing in page 26786 of the Interim Final Rule places constraints on the use of SLFRF monies. Rather, that page provides "background information" about the COVID-19 pandemic. *See* 86 Fed. Reg. at 26786.

50.     Similarly, nothing on page 26790 of the Interim Final Rule places constraints on the use of SLFRF monies. Rather, that page sets forth certain "Eligible Public Health Uses" of SLFRF monies. *See* 86 Fed. Reg. at 26790.

51.     In the October 5 letter, Treasury demanded that OSPB supply a "response describing how the State will remediate the issues identified" with Plus-Up and ERB. Citing 31 C.F.R. § 35.10, Treasury stated that "[f]ailure to respond to or remediate may result in administrative or other action." [Ex. 3 at 2.]

---

[2] Nothing in either the Plus-Up program or the ERB program prohibited students from wearing masks or taking other precautions against COVID.

52.     The Governor's Office responded on November 4, 2021 with a letter to Treasury detailing how these programs sought to address the negative economic impacts of COVID-19, as permitted by ARPA, and how the programs were consistent "with the guidance released by the Treasury governing the program, including the Interim Final Rule and all posted Frequently Asked Questions (FAQs)." [Exhibit 4, Nov. 4, 2022 Letter from OSPB to Treasury, at 3.]

53.     Regarding Plus-Up, OSPB stated that this program "addresses educational disparities by ensuring schools have the funding necessary to effectively meet the needs of every student, regardless of their family's income or socioeconomic status.[3] Moreover, by limiting funding to only schools that remain open for in-person instruction, the State is addressing the significant educational disparities caused by remote learning during the COVID-19 pandemic." [*Id.*]

54.     Regarding ERB, OSPB stated that this program "empowers parents to exercise their freedom to make informed decisions regarding their child's educational needs. For parents who prioritize their child's social, emotional, and mental health needs and believe a mask mandate would adversely impact their child, the program offers these parents the freedom and funding to enroll their student in a different program absent of a mask mandate. To reduce the spread of COVID-19 without the need for masks, Arizona already offers free COVID-19 testing for all residents." [*Id.* at 3-4.]

55.     The November 4 letter also cited specific provisions of the Interim Final Rule, and Treasury FAQs on that rule, further demonstrating that Plus-Up and ERB were permissible uses of SLFRF funds. [*Id*. at 3.]

56.     Additionally, the November 4 letter provided other important background information supporting the two programs.  For instance, the November 4 letter explained that students in the "poorest 20% of U.S. neighborhoods" are most damaged by the COVID-19 pandemic. [*Id* at 1.] It also noted that, according to the CDC, COVID-19 "has a lower

---

[3] This funding was necessary because of the grossly disproportionate distribution of federal funding to some schools over others when all schools suffered effects from COVID-19.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

likelihood of transmission among students." [*Id.*] "Indeed, in the United Kingdom, frequent rapid testing was found to be effective at reducing the transmission of the Delta COVID-19 variant amongst students, even if students did not wear masks." [*Id.*] The November 4 letter further stated that "experts have warned that masks can be harmful to children's emotional development, as seeing faces and reading emotional queues are critical for school-aged children." [*Id.* at 2.]

**V.    Treasury Issues a Final Rule Attaching New, Unlawful Restrictions on the Use of SLFRF Funds.**

57.    On January 6, 2022, Treasury issued a Final Rule that "adopt[ed] as final the interim final rule published on May 17, 2021 with amendments." [Exhibit 5, Final Rule, at 1.]

58.    One such "amendment" added in the Final Rule, though, was a wholesale change to the previous provisions that is not supported by ARPA. That amendment is a purported prohibition on using SLFRF funds on a "program or service that imposes conditions on participation or acceptance of the service that would undermine efforts to stop the spread of COVID-19 or discourage compliance with recommendations and guidelines in CDC guidance for stopping the spread of COVID-19." [*Id.* at 346 (also explaining that "recipients may not use funds for a program that undermines practices included in the CDC's guidelines and recommendations for stopping the spread of COVID-19"); *see also id.* at 10, 58 (similar).]

59.    Supposedly impermissible "programs or services" to be determined by Treasury include "programs that impose a condition to discourage compliance with practices in line with CDC guidance (e.g., paying off fines to businesses incurred for violation of COVID-19 vaccination or safety requirements), as well as programs that require households, businesses, nonprofits, or other entities not to use practices in line with CDC guidance as a condition of receiving funds (e.g., requiring that businesses abstain from requiring mask use or employee vaccination as a condition of receiving SLFRF funds)." [*Id.* at 346.]

60. The Final Rule does not cite any statutory text from ARPA to support this new prohibition. No such text exists.

61. The prohibition on using SLFRF funds for programs that allegedly "undermine" constantly changing CDC recommendations related to COVID-19 mitigation efforts is also not found in the Interim Final Rule.

62. Treasury is not a public health agency and does not have expertise in stopping the spread of COVID-19.

63. The effective date of the final rule is April 1, 2022. [*Id.* at 1.] Until the Final Rule becomes effective, the Interim Final Rule remains binding and effective. [*Id.* at 121.]

**VI.    Citing the Final Rule, Treasury Demands Action by the Governor Within 60 Days.**

64. On January 14, 2022, Treasury sent another letter to the Governor's Office, once again raising concerns with Plus-Up and ERB. The letter re-iterated Treasury's flawed position that SLFRF monies may not be used on programs that supposedly "undermine" efforts to stop the spread of COVID-19 and that Plus-Up and the ERB supposedly fail that test because of how they address school mask mandates. [Exhibit 6, Jan. 14 Letter from Treasury to OSPB, at 1-2.] Based on this, Treasury claimed that the Plus-Up program and the ERB program "as currently structured are ineligible uses of SLFRF funds." [*Id.* at 2.]

65. Similar to its previous letter, Treasury did not point to any statutory text from ARPA to support its position. The January 14 letter does not even cite 42 U.S.C. § 802(c) or any other provision of the ARPA.

66. The January 14 letter instead makes the irrelevant point that "the Interim Final Rule permits SLFRF funds to be used for a range of COVID-19 mitigation strategies, including face coverings, vaccination programs, and improved ventilation." [*Id.* at 1 n.1.] But this is simply one of the *non-exclusive*, possible uses of SLFRF monies. There is no mandate in ARPA, or the Interim Final Rule, that SLFRF monies be used on "COVID-19 mitigation strategies."

67. At different points, the January 14 letter also cites the Final Rule. Most

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

relevant here, the January 14 letter asserts: "[t]he Final Rule, which was issued on January 6, 2022, further clarifies how SLFRF funds may be used, including that a recipient may not use SLFRF funds for a program, service, or capital expenditure that includes a term or condition that undermines efforts to stop the spread of COVID-19." [Jan. 14 Letter at 1 n.1.]

68. The January 14 letter does not acknowledge that the Final Rule only becomes effective on April 1, 2022.  Nor did Treasury provide any basis for giving the Final Rule retroactive effect to recoup previously distributed SLFRF monies. *See*, *e.g.*, *Afanador v. Garland*, 11 F.4th 985, 991 (9th Cir. 2021) ("When an agency engages in formal rulemaking, the rules it promulgates are analogous to legislation and are construed to apply only prospectively (unless Congress has expressly authorized it to promulgate a retroactively applicable rule).").

69. Nevertheless, the January 14 letter used that not-yet-effective Final Rule to demand action by the Governor. In particular, Treasury stated that the Governor must "(i) redirect SLFRF funds to eligible uses or (ii) remediate the issues with the Education Plus-Up Grant Program and the COVID-19 Educational Recovery Benefit Program by redesigning the programs to eliminate any elements that are inconsistent with the purpose and requirements of the SLFRF program." [Ex. 6 at 2.]

70. Treasury described two consequences from a lack of compliance with its demands. First, it stated that "[f]ailure to take either step within sixty (60) calendar days may result in Treasury initiating an action to recoup SLFRF funds used in violation of the eligible uses." [*Id.*] Second, Treasury stated that it "may also withhold funds from the State of Arizona's second tranche installment of SLFRF funds until Treasury receives information that confirms that the issues described above have been adequately addressed." [*Id.*]

71. In light of this history, there is no question that this controversy is ripe and that Governor Ducey has Article III standing. Treasury had no statutory authority to require the State to use SLFRF monies in a manner that, pursuant to Treasury's sole discretion, would not undermine efforts to stop the spread of COVID-19.  Instead, Treasury, in an

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

abuse of discretion, issued the Final Rule well in excess of its statutory authority. With the recent issuance of the Final Rule, however, Treasury has demanded that Governor Ducey either comply with the Rule—even though it far exceeds Treasury's statutory authority— or else face recoupment and withholding of SLFRF monies within 60 days.[4] The Governor's Office will not eliminate or change the Plus-Up and ERB programs to conform to Treasury's unlawful dictates. The concrete and particularized injury-in-fact to the Governor is therefore actual or imminent, not conjectural or hypothetical. *See, e.g.*, *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 748 (9th Cir. 2020); *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153-54 (9th Cir. 2017).

## **FIRST CAUSE OF ACTION**

### **(Violation of the Administrative Procedure Act—Final Rule)**

72.    Governor Ducey incorporates the allegations in the preceding paragraphs as if fully set forth herein.

73.    The Administrative Procedure Act ("APA") authorizes the Court to hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

74.    The Final Rule is a final agency action within the meaning of the APA.  5 U.S.C. § 551(13).

75.    Governor Ducey has suffered legal wrong and is adversely affected or aggrieved by the Final Rule. 5 U.S.C. § 702. As stated, Governor Ducey is the party authorized by Arizona law to accept and expend the SLFRF monies that Treasury seeks to withhold and recoup. *See* A.R.S. § 41-101.01(A). The Final Rule seeks to impose new conditions on how Governor Ducey may exercise this authority, and prohibit programs like Plus-Up and ERB that were instituted before the issuance of the Final Rule. Indeed,

---

[4] The Governor notes that Treasury further abused its authority by requiring the State of Arizona to comply with the Final Rule before that rule ever goes into effect, since the response would be due to Treasury on March 15, 2022 and the rule would not go into effect until April 1, 2022.

Treasury specifically cited the Final Rule as grounds to demand that Governor Ducey change these programs within 60 days or else face recoupment and withholding of SLFRF monies.

76.     It is axiomatic that a federal agency must have statutory authority for the regulations it issues. *See, e.g.*, *Mexichem Fluor, Inc. v. Env't Protection Agency*, 866 F.3d 451, 460 (D.C. Cir. 2017) ("The agency must have statutory authority for the regulations it wants to issue.").  "Merely because an agency has rulemaking power does not mean that it has delegated authority to adopt a particular regulation." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020).

77.     Here, the Final Rule far exceeds the limited statutory authority granted to Treasury by ARPA.  That statute did not confer Treasury with power to prohibit States from expending SLFRF monies in a manner that in Treasury's subjective and extraordinary determination "would undermine efforts to stop the spread of COVID-19 or discourage compliance with recommendations and guidelines in CDC guidance for stopping the spread of COVID-19." [Ex. 5 at 346].

78.     To the contrary, Congress specifically described the permissible uses of SLFRF funds, as well as restrictions on such uses, in 42 U.S.C. § 802(c).  In describing how the funds may be used, Congress did not prohibit States from expending SLFRF monies in a manner that Treasury subjectively believes will "undermine" COVID-19 mitigation efforts or require states to follow CDC guidance in implementing programs that expend SLFRF monies. Neither § 802(c), nor any other provision of ARPA, authorizes Treasury to create new restrictions that are untethered to and inconsistent with the text of the ARPA.

79.     The first category of permissible use of SLFRF monies identified by Congress discussed is particularly instructive here. That category allows SLFRF monies to be used "to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) *or* its negative economic impacts." 42 U.S.C. § 802(c)(1)(A) (emphasis added).  Congress used the word "or"—not "and." At no point did Congress suggest that, in addressing "negative economic impacts," States must structure programs to comply with

COVID-19 mitigation guidance.

80.     Nor is the Final Rule's extra-statutory restriction on SLFRF monies "necessary or appropriate to carry out" Section 802 of ARPA. *See* 42 U.S.C. § 802(f).

81.     Although the plain language of ARPA is sufficient to conclude that the Final Rule exceeds Treasury's statutory authority, this conclusion is buttressed by the "major questions" doctrine.   Under this doctrine, and as recently affirmed by the U.S. Supreme Court, courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Assn. of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (quotation omitted); *Nat'l Fed'n of Indep. Bus.*, 2022 WL 120952, at *3 (same).

82.     If Congress intended to give Treasury—which has absolutely no expertise in matters of public health—the authority to withhold or recoup tens of millions of dollars from States based on Treasury's subjective assessment of whether a State program "undermines" COVID-19 mitigation efforts, Congress needed to "speak clearly."

83.     The need for Congress to "speak clearly" is particularly pressing where, as here, Treasury's Final Rule would "intrude[] into . . . area[s] that [are] the particular domain of state law"—public health and education policy. *Ala. Assn. of Realtors*, 141 S. Ct. at 2489. By contrast, public-health policy is completely outside the domain of Treasury, which lacks the expertise required to assess whether a particular expenditure of SLFRF funds "would undermine efforts to stop the spread of COVID-19."

84.     Because Congress did not "speak clearly" (or, indeed, speak at all) on this issue of vast economic and political significance, the Final Rule exceeds Treasury's statutory authority.   It is also arbitrary, capricious, an abuse of discretion, and contrary to law. The Final Rule must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 702(2)(A) and (2)(C).

…

…

…

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**SECOND CAUSE OF ACTION**

**(Violation of the Administrative Procedure Act—January 14 Treasury Demand Letter)**

85.   Governor Ducey incorporates the allegations in the preceding paragraphs as if fully set forth herein.

86.   The January 14 letter is a final agency action within the meaning of the APA. 5 U.S.C. § 551(13).

87.   Because Arizona law makes Governor Ducey responsible for accepting and expending the SLFRF monies that Treasury seeks to withhold and recoup, A.R.S. § 41-101.01(A), Governor Ducey has suffered legal wrong and is adversely affected or aggrieved by the January 14 letter. 5 U.S.C. § 702.

88.   Treasury exceeded its statutory authority under 42 U.S.C. § 802, acted arbitrarily and capriciously, and abused its discretion, and acted contrary to law in demanding that Governor Ducey eliminate or modify the Plus-Up and ERB programs on the grounds that these programs allegedly "impose[] conditions on participation in or acceptance of the service that would undermine efforts to stop the spread of COVID-19 or discourage compliance with recommendations and guidelines in CDC guidance for stopping the spread of COVID-19." [Ex. 5 at 346; *see also* Ex. 6 at 1.]

89.   Nothing in ARPA authorizes Treasury to impose such conditions on SLFRF monies. None of the four categories of permissible use, or the two use restrictions, in 42 U.S.C. § 802(c) come close to prohibiting States from expending SLFRF monies in a manner that Treasury determines will "undermine" COVID-19 mitigation efforts or require compliance with CDC guidance or recommendations. Nor does anything in ARPA give Treasury authority to impose new conditions on how SLFRF monies are used that are not found anywhere in the statutory text.

90.   Likewise, the Interim Final Rule fails to authorize Treasury's action. That rule does not say anything about mask mandates in schools or any other measures that supposedly "undermine" COVID-19 mitigation efforts. Similarly, the Interim Final Rule

does not require States to abide secondhand, ever-changing CDC guidance in implementing programs that expend SLFRF monies.

91.    The Final Rule also cannot provide any grounds for recoupment or withholding since that Rule exceeds Treasury's authority and does not become effective until April 1, 2022.

92.    Plus-Up and ERB are entirely consistent with 42 U.S.C. § 802(c) because they respond to the "negative economic impacts" of the COVID-19 pandemic by, among other things, providing economic assistance to households and schools to address the pandemic's impact on education.

93.    Because Treasury's actions have no basis in statute or the currently effective regulation, Treasury has exceeded its authority, abused its discretion, and acted arbitrarily, capriciously, and contrary to law, all in violation of the APA. *See* 5 U.S.C. § 706(2). The January 14 letter must therefore be held unlawful and set aside pursuant to 5 U.S.C. § 702(2)(A) and (2)(C).

## THIRD CAUSE OF ACTION

### (Declaratory Judgment—Violation of the Spending Clause)

94.    Governor Ducey incorporates the allegations in the preceding paragraphs as if fully set forth herein.

95.    Article I, § 8, cl. 1 of the U.S. Constitution (the Spending Clause) empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

96.    If, however, Congress "desires to condition the States' receipt of federal funds," then it "must do so unambiguously . . . enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) (alteration in original).

97.    If the Final Rule is authorized by statute (it is not), then it violates the Spending Clause because the enabling statute, 42 U.S.C. § 802, is ambiguous in the strings

it attaches to the use of SLFRF monies.

98.     In particular, 42 U.S.C § 802 does not give States any notice that SLFRF monies could, at some future date, be withheld or recouped based on Treasury's determination that the State's use of the monies "undermine[s] efforts to stop the spread of COVID-19." And § 802 certainly does not alert States to the possibility that their use of SLFRF monies must comport with the CDC's ever-changing COVID-19 guidance.

99.     Accordingly, even if the Final Rule is somehow authorized by statute, it violates the Spending Clause.

### FOURTH CAUSE OF ACTION

### (Declaratory Judgment—Violation of the Non-Delegation Doctrine)

100.    Governor Ducey incorporates the allegations in the preceding paragraphs as if fully set forth herein.

101.    Article I, § 1, of the U.S. Constitution vests "[a]ll legislative Powers herein granted ... in a Congress of the United States."

102.    Thus, "when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 472-73 (2001) (quoting *J.W. Hampton, Jr. & Co v. United States*, 276 U.S. 394, 409 (1928)) (emphasis in original omitted).

103.    If the Final Rule is authorized by ARPA (again, it is not), then this means that the Act sets forth no "intelligible principle[s]" guiding Treasury's decisions to withhold or recoup SLFRF monies.

104.    Rather, if the Final Rule is authorized by ARPA, then this means Treasury has unfettered discretion to add new conditions on SLFRF funds, including conditions based on Treasury's beliefs about what COVID-19 mitigation strategies are appropriate, despite the fact that Treasury is not a public health agency and does not have expertise in this area.

105.    Accordingly, if the Final Rule falls within the authority granted to Treasury by ARPA, then the Act violates the non-delegation doctrine.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

### **PRAYER FOR RELIEF**

Wherefore, Governor Ducey requests that this Court:

A.     Declare that the Final Rule is unlawful and must be set aside because the Final Rule exceeds Treasury's statutory authority, is an abuse of discretion, is arbitrary and capricious, and is contrary to law;

B.     Declare that Defendants have abused their discretion, exceeded their statutory authority, and acted arbitrarily, capriciously, and contrary to law by demanding that Governor Ducey eliminate or modify existing SLFRF programs;

C.     Permanently enjoin Defendants from enforcing against Governor Ducey and the State of Arizona the Final Rule's unlawful restriction on programs that allegedly undermine efforts to stop the spread of COVID-19 or discourage compliance with recommendations and guidelines in CDC guidance for stopping the spread of COVID-19.

D.     Permanently enjoin Defendants from withholding or recouping SLFRF monies from the State of Arizona based on the conditions of the Plus-Up and ERB programs;

E.     Awarding Plaintiff reasonable costs and expenses of this action, including attorneys' fees; and

F.     Grant other such relief as may be just and proper.

1    DATED this 21st day of January, 2022.

2                                                GENERAL COUNSEL

3

4                                         By:  /s/ Anni L. Foster
5                                             Anni L. Foster
                                             Office of Governor Douglas A. Ducey
6                                             1700 West Washington Street
                                             Phoenix, Arizona  85007
7

8                                             SNELL & WILMER L.L.P.

9

10                                        By:  /s/ Brett W. Johnson
11                                            Brett W. Johnson
                                             Colin P. Ahler
12                                            Derek C. Flint
                                             Ian R. Joyce
13                                            One Arizona Center
                                             400 E. Van Buren, Suite 1900
14                                            Phoenix, Arizona  85004-2202

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000