BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
100 L Street, NW
Washington, DC 20005
Tel.: (202) 305-0693
Email: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas A. Ducey, Governor of the State of Arizona, in his official capacity, | Case No. 2:22-cv-00112-SPL |
| Plaintiff, | Related case: 2:21-cv-00514-DJH |
| v. | **DEFENDANTS' MOTION TO DISMISS** |
| Janet Yellen, Secretary of the Treasury, in her official capacity, *et al.*, | |
| Defendants. | |

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

BACKGROUND .....................................................................................2

LEGAL STANDARDS ...........................................................................6

ARGUMENT...........................................................................................6

    I.     The Governor's claims are not justiciable. ...................................6

          A. The Governor lacks Article III standing and the case is
          unripe................................................................................... 6

          B. The January 14 letter is not a final agency action. ...............10

    II.    The Governor fails to state a claim on the merits....................11

          A. The Final Rule is "necessary or appropriate" to carry
          out the purposes of the Rescue Plan. ......................................11

          B. The Governor's Spending Clause claim should be
          dismissed.............................................................................15

          C. The Rescue Plan does not violate the nondelegation
          doctrine...............................................................................16

CONCLUSION ....................................................................................17

1

## <u>TABLE OF AUTHORITIES</u>

2

## <u>Cases</u>

3

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*

4
    141 S. Ct. 2485 (2021) ........................................................................14

5

*Alcoa, Inc. v. Bonneville Power Admin.,*

6
    698 F.3d 774 (9th Cir. 2012) ...............................................................9

7

*Arizona v. Yellen,*

8
    550 F. Supp. 3d 791 (D. Ariz. 2021), *appeal filed*, No. 21-16227

9
    (9th Cir. 2021). ................................................................2, 9, 16

10

*Arkansas v. Oklahoma,*

11
    503 U.S. 91 (1992) ..............................................................................12

12

*Ashcroft v. Iqbal,*

13
    556 U.S. 662 (2009) .............................................................................6

14

*Bell Atl. Corp. v. Twombly,*

15
    550 U.S. 544 (2007) .............................................................................6

16

*Bennett v. Dep't of Educ.,*

17
    470 U.S. 656 (1985) .................................................................9, 15, 16

18

*Bennett v. New Jersey,*

19
    470 U.S. 632 (1985) .............................................................................9

20

*Bennett v. Spear,*

21
    520 U.S. 154 (1997) ...........................................................................10

22

*Benning v. Georgia,*

23
    391 F.3d 1299 (11th Cir. 2004) ........................................................16

24

*Bishop Paiute Tribe v. Inyo Cnty.,*

25
    863 F.3d 1144 (9th Cir. 2017) ...........................................................9

26

*Chandler v. State Farm Mut. Auto Ins. Co.,*

27
    598 F.3d 1115 (9th Cir. 2010) ...........................................................6

28

*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003) ...........................................................16

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019) ....................................................................15

*Darby v. Cisneros*,
   509 U.S. 137, 144 (1993) ............................................................................9

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999) ....................................................................................16

*Env't Info. Ctr. v. Stone-Manning*,
   766 F.3d 1184 (9th Cir. 2014) ....................................................................9

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
   543 F.3d 586 (9th Cir. 2008) ......................................................................10

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ....................................................................................14

*GEO Grp., Inc. v. Newsom*,
   15 F. 4th 919, 930 (9th Cir. 2021) ..............................................................12

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ....................................................................................14

*Gundy v. United States*,
   139 S. Ct. 2116 (2019), *cert. denied*, 142 S. Ct. 813 (2022) ......................16

*Idaho Wool Growers Ass'n v. Vilsack*,
   816 F.3d 1095, 1102 (9th Cir. 2016) ..........................................................13

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ....................................................................................15

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ....................................................................................6

*King v. Burwell*,
   576 U.S. 473 (2015) ....................................................................................14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................6

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ...............................................................15, 16

*Biden v. Missouri,*
   142 S. Ct. 647 (2022) ...........................................................................16

*Mourning v. Family Publ'ns Serv., Inc.,*
   411 U.S. 356 (1973) ................................................................11, 12, 13

*Nat'l Broadcasting Co. v. United States,*
   319 U.S. 190 (1943) ...............................................................................17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor ("NFIB"),*
   142 S. Ct. 661 (2022) ...........................................................................14

*Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB"),*
   567 U.S. 519 (2012) ........................................................................14, 15

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003) ................................................................................ 9

*Oklahoma v. U.S. Civ. Serv. Comm'n,*
   330 U.S. 127 (1947) ...............................................................................14

*Pennhurst State School & Hospital v. Halderman,*
   451 U.S. 1 (1981) ....................................................................................15

*Pub. Serv. Comm'n of Utah v. Wycoff Cnty.,*
   344 U.S. 237 (1952) .................................................................................7

*Sabri v. United States,*
   541 U.S. 600 (2004) ...............................................................................14

*Sackett v. EPA,*
   566 U.S. 120 (2012) ...............................................................................10

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*
   968 F.3d 738 (9th Cir. 2020) ................................................................7

*Soundboard Ass'n v. FTC,*
   888 F.3d 1261 (D.C. Cir. 2018) ...........................................................10

*Thomas v. Anchorage Equal Rts. Comm'n,*
   220 F.3d 1134 (9th Cir. 2000) ...................................................................7

*Thorpe v. Hous. Auth. of Durham,*
   393 U.S. 268 (1969) ...................................................................................12

*United States ex rel. Solis v. Millennium Pharms. Inc.,*
   885 F.3d 623 (9th Cir. 2018) .......................................................................6

*United States v. Melgar-Diaz,*
   2 F.4th 1263 (9th Cir. 2021) ................................................................16, 17

*United States v. Motamedi,*
   Civ. A. No. 20-10364, 2022 WL 101951 (9th Cir. Jan. 11, 2022)..............17

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ...................................................................................14

*Van Wyhe v. Reisch,*
   581 F.3d 639 (8th Cir. 2009) .....................................................................16

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ...................................................................................17


**Statutes**

5 U.S.C. § 704................................................................................................9

42 U.S.C. § 802........................................................................................ *passim*

42 U.S.C. § 803............................................................................................ 2

42 U.S.C. § 804............................................................................................2

42 U.S.C. § 805............................................................................................2

42 U.S.C. § 4332 .........................................................................................13

Ariz. Rev. Stat. Ann. § 41-193 ....................................................................6

American Rescue Plan Act,
   Pub. L. No. 117-2, 135 Stat. 4 (2021) (codified at 42 U.S.C. §§ 802–805)..............1, 2

**Federal Regulations**

31 C.F.R. § 35.6 ................................................................................................ 4

31 C.F.R. § 35.10 ....................................................................................... *passim*

Coronavirus State and Local Fiscal Recovery Funds,
   86 Fed. Reg. 26,786 (May 17, 2021)............................................................2

Coronavirus State and Local Fiscal Recovery Funds,
   87 Fed. Reg. 4,338 (Jan. 27, 2022) ...................................................... *passim*


**Other Authorities**

U.S. Dep't of the Treasury, *Treasury Issues Final Rule for State and Local Fiscal Recovery Funds Program to Support the Ongoing COVID Response* (Jan. 6, 2022), https://home.treasury.gov/news/press-releases/jy0550  .................................3, 4

## INTRODUCTION

As part of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. States may use these new federal funds to mitigate the public health emergency caused by COVID-19 or its negative economic impacts, among other permissible uses. *Id.* § 802(c)(1). In contravention of these purposes, however, Arizona has created a program that withholds federal funds from local school districts that choose to implement a mask policy designed to slow the spread of the coronavirus. The State also provides federal funds to families who transfer their children out of a school that requires masks. These programs are either intended to discourage or have the effect of discouraging local school districts from implementing COVID-19 safety protocols in line with Centers for Disease Control and Prevention ("CDC") guidance.

The Rescue Plan provides the Secretary of the Treasury with "the authority to issue such regulations as may be necessary or appropriate to carry out this section." *Id.* § 802(f). Under this broad grant of authority, the Secretary issued a Final Rule clarifying that states may not use Rescue Plan funds for programs that undermine efforts to stop the COVID-19 pandemic. The Department of the Treasury has also sent two letters informing Arizona that its school funding policies are inconsistent with Treasury's interpretation of the Act.

The Complaint should be dismissed for lack of jurisdiction and for failure to state a claim. Because Treasury has not initiated any enforcement proceedings, Governor Ducey ("Governor") cannot establish that any alleged injury is imminent. And to the extent the Governor challenges one of Treasury's letters, that letter is not a final agency action subject to judicial review. The Final Rule is also within the Secretary's broad power to issue appropriate regulations under the Rescue Plan, and neither the Final Rule nor the Rescue Plan violates the Spending Clause or the nondelegation doctrine.

## BACKGROUND

On March 11, 2021, Congress enacted the American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805). The Rescue Plan establishes a "Coronavirus State Fiscal Recovery Fund," allocating $220 billion to "mitigate the fiscal effects" of the pandemic on States, territories, and Tribal governments through 2024. 42 U.S.C. § 802(a)(1); *see id.* § 803(a) (additional $130 billion for localities). Nearly $200 billion is allocated for the States and the District of Columbia. *Id.* § 802(b)(3)(A).

The Rescue Plan provides that States may use the funds for pandemic-related purposes. Through 2024, a State may use the funds "to cover costs incurred" "to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality," among other uses. *Id.* § 802(c)(1)(A). The Rescue Plan also includes two "further restriction[s]" on the use of funds, *id.* § 802(c)(2), one of which is the subject of a related case in this Court, *see generally Arizona v. Yellen*, 550 F. Supp. 3d 791 (D. Ariz. 2021) (Humetewa, J.), *appeal filed*, No. 21-16227 (9th Cir.).[1] If a recipient misuses Rescue Plan funds, the Act provides that Treasury may recoup the amount of any misuse. 42 U.S.C. § 802(e). And the Rescue Plan authorizes the Secretary "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. 42 U.S.C. § 802(f). On May 10, 2021, Treasury posted an Interim Final Rule implementing the Rescue Plan, which was published in the Federal Register the following week. *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021). The Interim Final Rule sets forth a specific, multi-step procedure for recoupment of any misused funds under the Rescue Plan. *Id.* at 26,811–12.

---

[1] Defendants have filed a motion to transfer related case, *see* Notice, ECF No. 11, on which briefing is complete.

On August 17, 2021, the Governor announced the "Education Plus-Up Grant Program." Compl. ¶ 38, ECF No. 1. Through this program, Arizona allocated $163 million in Rescue Plan funds to school districts and charter schools on the condition that the schools do *not* require students to use face masks during instructional hours. *Id.* ¶¶ 38, 41. The Governor also announced the "Educational Recovery Benefit Program," which provides $10 million in Rescue Plan funds to families of children who are in school districts that *do* require masks to be spent on tuition and other expenses associated with sending children to a different school that does not require masks. *Id.* ¶¶ 42–43.

On October 5, 2021, Treasury sent a letter to the Governor stating that the agency was "concerned that" these two programs "undermine evidence-based efforts to stop the spread of COVID-19." Letter from Adewale O. Adeyemo, Deputy Secretary of the Treasury, to Douglas Ducey, Governor of Arizona, at 1 (Oct. 5, 2021) ("Oct. 5 letter"), ECF No. 1-4. "The purpose of" the Rescue Plan funds "is to mitigate the fiscal effects stemming from the COVID-19 public health emergency, including by supporting efforts to stop the spread of the virus," the letter explained. *Id.* at 2. As such, Treasury stated, "[a] program or service that imposes conditions on participation or acceptance of the service that would undermine efforts to stop the spread of COVID-19 or discourage compliance with evidence-based solutions for stopping the spread of COVID-19 is not a permissible use of" Rescue Plan funds. *Id.* Treasury "request[ed]" that Arizona "describ[e] how the State will remediate the issues identified" with these programs, and noted that "[f]ailure to respond or remediate may result in administrative or other action." *Id.* Arizona responded by letter on November 4, 2021, providing the State's explanation of the intended purpose of the two programs. *See* Letter from Jason Mistlebauer to Jacob Leibenluft (Nov. 4, 2021) ("Nov. 4 letter"), ECF No. 1-5.

On January 6, 2022, Treasury issued a Final Rule that "adopt[ed] as final the

interim final rule . . . with amendments." Coronavirus State and Local Fiscal Recovery Funds, 87 Fed. Reg. 4,338, 4,338 (Jan. 27, 2022); *see also* U.S. Dep't of the Treasury, *Treasury Issues Final Rule for State and Local Fiscal Recovery Funds Program to Support the Ongoing COVID Response* (Jan. 6, 2022), https://home.treasury.gov/news/press-releases/jy0550. The text of the Final Rule explains when a use of funds is deemed permissible, including for programs or services that "respond[] to" a "harm or impact to a beneficiary or class of beneficiaries caused or exacerbated by the public health emergency or its negative economic impacts." *Id.* at 4,448 (to be codified at 31 C.F.R. § 35.6(b)(1)). The Final Rule preamble further explains that "[a] program or service that imposes conditions on participation or acceptance of the service that would undermine efforts to stop the spread of COVID-19 or discourage compliance with recommendations and guidelines in CDC guidance for stopping the spread of COVID-19 is not a permissible use of" Rescue Plan funds. *Id.* at 4,431. "In other words, recipients may not use funds for a program that undermines practices included in the CDC's guidelines and recommendations for stopping the spread of COVID-19." *Id.* Examples of programs that would not be a permissible use of funds for this reason include "paying off fines to business incurred for violation of" COVID-19 safety protocols and "requiring that businesses" and other entities "abstain from requiring mask use . . . as a condition of receiving" Rescue Plan funds. *Id.*

The Final Rule contains the requisite procedures for any recoupment action. As a preliminary matter, the Final Rule provides that, prior to seeking recoupment, the Secretary may notify recipients of potential violations and provide opportunities for informal consultation and remediation. 31 C.F.R. § 35.10(g) (2022). If Treasury decides to initiate recoupment, it must first "provide the recipient an initial written notice of the amount subject to recoupment along with an explana-

tion of such amounts." *Id.* § 35.10(c). Then, if the recipient wants to request consideration, it must submit a request a within 60 days.[2] *Id.* § 35.10(d). The Secretary then has 60 days to affirm, withdraw, or modify the notice of recoupment. *Id.* § 35.10(e). Recipients have 120 days from the Secretary's final decision to repay amounts owed. *Id.* § 35.10(f). Further, the Final Rule requires recipients to "invoke and exhaust the procedures available under this subpart prior to seeking judicial review." *Id.* § 35.10(e).

On January 14, 2022, Treasury sent a second letter to Arizona stating that, "[b]y discouraging families and school districts from following [the CDC's] guidance, the conditions" attached with these programs "undermine efforts to stop the spread of COVID-19," and that the programs as currently structured were thus "ineligible uses" of Rescue Plan funds. Letter from Kathleen B. Victorino to Jason Mistlebauer, at 2 (Jan. 14, 2022) ("Jan. 14 letter"), ECF No. 1-7. The letter requested that Arizona either redirect Rescue Plan funds to eligible uses or restructure its educational programs to eliminate the conditions identified, and noted that failure to do so "may result in Treasury initiating an action to recoup" Rescue Plan funds or withholding funds from Arizona's "second tranche installment" of Rescue Plan funds. *Id.* Treasury also stated that its "compliance program would welcome the opportunity to discuss [its] concerns" and that it "is committed to working with recipients to take advantage of the many eligible uses and great flexibility available under" the Rescue Plan. *Id.*

On January 21, 2022, the Governor brought this suit challenging the Final Rule and the January 14 letter. Compl. ¶¶ 74–75, 86–87. The Governor asserts that both the Final Rule and the January 14 letter exceed Treasury's authority under the Rescue Plan. *Id.* ¶ 77, 88. The Governor also claims that the Final Rule is un-

---

[2] The Final Rule permits the Secretary to extend or shorten the time periods set forth in 31 C.F.R. § 35.10 (2022).

constitutionally ambiguous under the Spending Clause, *id.* ¶ 97, and that the Rescue Plan violates the nondelegation doctrine, *id.* ¶ 103. This motion follows.

## LEGAL STANDARDS

The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 625 (9th Cir. 2018). In order for the Court to have jurisdiction over a challenge to agency action, the plaintiff must have standing to sue and the claims must be ripe for adjudication. *See, e.g.*, *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I. THE GOVERNOR'S CLAIMS ARE NOT JUSTICIABLE.

#### A. The Governor lacks Article III standing and the case is unripe.

To satisfy the "irreducible constitutional minimum" of Article III standing—as required to invoke this Court's jurisdiction—the Governor must first demonstrate "a concrete and particularized" injury in fact that is "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As an initial matter, any conceivable harm arising out of the allegations in the Complaint runs to the State of Arizona, which is not named as a plaintiff in this lawsuit.[3] If, at some point, Treasury seeks recoupment or withholds future funds, the State of Arizona would incur a pocketbook injury to its treasury. *See* 42 U.S.C. § 802(b)(3)(A) (directing that Rescue Plan funds be available to the "States"). In general, an official named in his or her "official capacity" is to be treated the same as the entity he or she represents. *Kentucky v. Graham*, 473 U.S.

---

[3] Notably, the Arizona "department of law," the agency charged with "[r]epresent[ing] th[e] state in any action in a federal court," Ariz. Rev. Stat. Ann. § 41-193, is not involved in this action.

159, 166 (1985). Here, however, the Governor has disavowed that any harm to the State is attributable to him. *See* Pls.' Response in Opp'n to Mot. to Transfer, at 6, ECF No. 16. Instead, the Governor asserts that because *he* instituted the educational programs at issue, he has been harmed, separate from any fiscal consequence to the State. *See id.* at 5; *see also* Compl. ¶¶ 75, 87. Such an injury is not cognizable.

In any event, no injury to the Governor—or the State—is imminent. The Governor's pre-enforcement claims are thus hypothetical and speculative. *See Pub. Serv. Comm'n of Utah v. Wycoff Cnty.*, 344 U.S. 237 (1952). "For there to be jurisdiction over a preenforcement challenge, 'there must be a genuine threat of imminent prosecution.'" *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747–48 (9th Cir. 2020) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement.'" *Thomas*, 220 F.3d at 1139.

The Governor lacks pre-enforcement standing to seek a judicial resolution of the disagreement between Treasury and the State concerning the permissibility of the State's grant programs because Treasury has not initiated recoupment proceedings or even stated unequivocally that it would do so. The October 5 letter says only that a failure to comply with Treasury's request "*may* result in administrative or other action." Oct. 5 letter, at 2 (emphasis added). The January 14 letter likewise states only that a failure to remediate "*may* result in Treasury initiating an action to recoup" Rescue Plan funds or that "Treasury *may* . . . withhold funds from the State of Arizona's second tranche installment." Jan. 14 letter, at 2 (emphasis added). Further, Treasury's January 14 letter invited Arizona to engage constructively to find allowable uses for the funds. *See* Jan. 14 letter, at 2. Such "informal consultation" and alternate resolution processes, which are contemplated in the Final Rule, are distinct from the recoupment procedures, which

Treasury has not initiated. *See* 31 C.F.R. § 35.10(g) (2022); 87 Fed. Reg. at 4,439 ("Treasury may pursue other forms of remediation and monitoring in conjunction with, or as an alternative to, recoupment."). Given the broad nature of Treasury's statements, the absence of Treasury action initiating its administrative recoupment process, and Treasury's stated "commit[ment] to working with [State and Local Fiscal Recovery Fund] recipients," Treasury may exercise its enforcement discretion not to seek recoupment.[4]

The speculative nature of the Governor's pre-enforcement claims is highlighted by the fact that questions remain about what enforcement might look like. The January 14 letter does not state whether Treasury might recoup funds based on past misuse of funds, or only with respect to further expenditures under these programs. As noted above, a necessary first step for Treasury to seek recoupment is for Treasury to calculate the amount subject to recoupment and send a notice with an explanation of such amounts. *See* 31 C.F.R. § 35.10(c) (2022). Treasury has done neither of these things.

Because Treasury may decide not to initiate enforcement proceedings against Arizona, and because the contours of such proceedings, should they occur, remain unclear, the Governor's effort to seek a pre-enforcement judicial resolution of the dispute between Treasury and the State is improper. These claims

---

[4] Treasury's decision may be impacted by, among other things, its review of information provided by Arizona in its report filed for the period March 3, 2021 to December 31, 2021. Arizona's submission provided additional information regarding the education programs at issue, including Arizona's identification of its expenditures for these programs as eligible under 42 U.S.C. § 802(c)(1)(A). Treasury may seek additional information from recipients to clarify information provided in these reports, including, in the case of Arizona's education programs, more information regarding how these programs aim to achieve the cited eligible uses of funds to respond to the disproportionate impacts experienced by certain populations as a result of the public health emergency.

should be adjudicated, if at all, *after* Treasury has taken enforcement action. In-deed, courts routinely review agency decisions requiring the repayment of fed-eral funds *after* they occur. *See, e.g., Bennett v. Dep't of Educ.*, 470 U.S. 656, 658 (1985) (explaining that "the dispute is whether the Secretary correctly demanded repayment based on a determination that Kentucky violated requirements that Title I funds be used to supplement, and not to supplant, state and local expend-itures for education"); *Bennett v. New Jersey*, 470 U.S. 632, 637 (1985) (explaining that the dispute arose out of the Secretary's final decision ordering repayment of specified federal education funds). That is exactly the path the Court should take here by dismissing this case for lack of jurisdiction.

For similar reasons, this challenge to the Final Rule and the January 14 letter is not ripe. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003); *see also Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (discussing the overlap between standing and ripeness). The Governor's claimed harm here rests on the potential recoupment or withholding of some funds. *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012). But recoupment or with-holding may never come to pass. *See Arizona*, 550 F. Supp. 3d at 798 (finding that Arizona lacked standing because enforcement was not certain). And even if Treas-ury does institute enforcement proceedings, the amount that may be subject to recoupment is not yet known. So there has not been any "concrete action applying [Treasury's] regulation to [the Governor's] situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *see Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014).

Finally, the Final Rule provides extensive notice and process in advance of any payment coming due. Consistent with providing such notice and process, the Final Rule requires that recipients exhaust its procedures before seeking judicial review. 31 C.F.R. § 35.10(e) (2022). The Governor has not exhausted the available administrative remedies. *See Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (noting that

1  an agency may impose an exhaustion requirement through regulation).

2      **B.      The January 14 letter is not a final agency action.**

3         To the extent the Governor challenges the January 14 letter itself, *see* Compl.

4  ¶¶ 85–93, his claim is unreviewable because the January 14 letter is not a "final

5  agency action." 5 U.S.C. § 704.[5] An agency action is "final" only if two conditions

6  are met. "First, the action must mark the consummation of the agency's deci-

7  sionmaking process — it must not be of a merely tentative or interlocutory nature.

8  And second, the action must be one by which rights or obligations have been

9  determined, or from which legal consequences will flow." *Fairbanks N. Star Bor-*

10  *ough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (quoting *Bennett*

11  *v. Spear*, 520 U.S. 154, 177–78 (1997)); *see also Sackett v. EPA*, 566 U.S. 120, 127

12  (2012) (explaining that "consummation" means that an agency action is "not sub-

13  ject to further Agency review"). Thus, "*Bennett* directs courts to look at finality

14  from the agency's perspective (whether the action represents the culmination of

15  the agency's decisionmaking) and from the regulated parties' perspective

16  (whether rights or obligations have been determined, and legal consequences

17  flow)." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018). The Janu-

18  ary 14 letter fails both prongs.

19         First, the January 14 letter is not the culmination of Treasury's deci-

20  sionmaking process. Rather, it represents one step in a multi-step process. As

21  discussed above, the letter states only that Treasury "may" take certain actions

22  to recover misused funds. Treasury has not yet initiated any such proceedings,

23  and it maintains enforcement discretion to choose not to initiate proceedings. In-

24  deed, Treasury previously sent a different letter, on October 5, similarly inform-

25  ing the State that certain consequences may flow from its misuse of Rescue Plan

26  funds, suggesting that each of these letters is just one communication in a back-

27  and-forth between the State and Treasury. More communications between the

28

---

[5] The Final Rule, on the other hand, is a final agency action.

parties may follow before Treasury's ultimate determination on whether and how to recover funds, so these intermediate communications do not represent a consummation of the decisionmaking process.

Second, no legal consequences flow from the January 14 letter. As discussed above, Treasury has not definitively stated that it will seek to recover any misused funds. Nor has Treasury decided what specific amounts it would seek to recover, a necessary precursor to seeking recoupment. Because the January 14 letter does not determine any legal consequences for Arizona—much less specify the remedial actions to be taken or the timeframe for which misused funds will be recovered—the "legal consequences" prong is not satisfied. There is currently no final agency action arising from the letter for this Court to review.

## II.   THE GOVERNOR FAILS TO STATE A CLAIM ON THE MERITS.

The Governor puts forth three arguments on the merits. First, he claims that the Final Rule exceeds the Secretary's authority under the Rescue Plan. Second, he argues that the Final Rule violates the Spending Clause because it is unconstitutionally ambiguous. Third, he claims that, if the Final Rule is authorized by statute, then the Rescue Plan is an unconstitutional delegation of legislative authority. None of these claims has merit.

### A. The Final Rule is "necessary or appropriate" to carry out the purposes of the funds appropriated by the Rescue Plan.

The Final Rule falls well within the Secretary's authority to issue regulations. The statute expressly states that "[t]he Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). The Final Rule is "appropriate" to carry out Congress's provision of funds to the States under Section 802.

Addressing similar enabling language in other statutes, the Supreme Court has concluded that this language grants the agency "broad authority." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 365 (1973) (quotation marks omitted). More specifically, "[w]here the empowering provision of a statute states simply

that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,'" the Court held that "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Id.* at 369 (quoting *Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 280–81(1969)). The same is true of statutes that authorize regulations as the Secretary finds to be "appropriate." *See, e.g.*, *Arkansas v. Oklahoma*, 503 U.S. 91, 105 (1992); *GEO Grp., Inc. v. Newsom*, 15 F.4th 919, 930 (9th Cir. 2021) (noting that "statutory language—'appropriate' and 'necessary and proper'—is a hallmark of vast discretion" (footnote omitted)). Notably, § 802(f) uses the disjunctive "or." The Final Rule does not need to be both "necessary" *and* "appropriate"; it is authorized so long as it satisfies the broader "appropriate" standard.

The Rescue Plan is generally intended to mitigate the negative effects of the COVID-19 crisis. *See* 42 U.S.C. § 802(a)(1). The Act provides states with funds that may be used "to respond to the public health emergency with respect to [COVID-19] or its negative economic impacts," among other permissible uses. *Id.* § 802(c)(1). Consistent with the statute, the Final Rule says that States may use Rescue Plan funds to "respond[] to . . . harms" that are "caused or exacerbated by the public health emergency," or to "mitigat[e] and prevent[]" COVID-19 "in a manner that is consistent with recommendations and guidance from the [CDC]," among other permissible uses. 87 Fed. Reg. 4,448–49. And the Final Rule further clarifies that States may not use Rescue Plan funds "for a program that undermines practices included in the CDC's guidelines and recommendations for stopping the spread of COVID-19." *Id.* at 4,431. These restrictions are "reasonably related to the purpose of" the funds appropriated by the Rescue Plan. *Mourning*, 411 U.S. at 369. Programs that have the opposite effect, *i.e.*, that perpetuate the pandemic by "undermin[ing]" recommended CDC practices, do not help "to respond to the public health emergency." It was therefore appropriate

for Treasury to explain that such uses of Rescue Plan funds are inconsistent with the Act.

The Governor argues that the Final Rule is not authorized by § 802(f) because each of the two permissible uses of funds in § 802(c)(1)(A) — "respond[ing] to the public health emergency" and "respond[ing] to . . . its negative economic impacts" — are distinct options for recipients. *See* Compl. ¶ 79. Because Arizona's educational programs fall under the latter (economic impacts), the Governor says, Treasury has no authority to impose a condition that promotes the former (the public health emergency itself). *See id.* This argument ignores Treasury's "broad authority" under § 802(f). *Mourning*, 411 U.S. at 365. Because one of the purposes of the Rescue Plan is to mitigate the public health crisis, it is appropriate for Treasury to prohibit uses of funds that have the opposite effect. Were it otherwise, States could disregard the CDC's evidence-based guidelines, prolonging the pandemic while using the federal government's money to respond to the (unnecessarily prolonged) pandemic's "negative economic impacts." 42 U.S.C. § 802(c)(1)(A). It is irrelevant that the State believes it is pursuing a different goal of the Act. The Final Rule tells States that they may not undermine one purpose of the Act while claiming to advance another purpose. And the Secretary's broad authority clearly encompasses this common-sense conclusion.[6]

Finally, the Governor contends that the Final Rule violates the so-called "major questions doctrine" because Congress has not spoken clearly enough to

---

[6] The Governor also complains that Treasury does not have "expertise in matters of public health," and the Final Rule therefore goes beyond the Secretary's authority. Compl. ¶ 82. But the CDC does, and the Final Rule sensibly refers to "CDC's guidelines and recommendations for stopping the spread of COVID-19." 87 Fed. Reg. at 4,431. This is no oddity; agencies often must assess a variety of topics, sometimes in consultation with other agencies and outside experts, *see, e.g.*, *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1102 (9th Cir. 2016) (discussing the requirements of 42 U.S.C. § 4332(2)(C)), and a rule siloing an agency's authority only to a narrow field in which it operates would be unworkable.

delegate to Treasury the authority to determine that Rescue Plan funds may not be used to undermine COVID-19 mitigation protocols. Compl. ¶ 81 (citing *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021); *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor* ("*NFIB*"), 142 S. Ct. 661 (2022) (per curiam)). The "major question" canon of construction only applies when an administrative action represents an "enormous and transformative expansion in [an agency's] regulatory authority." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *accord NFIB*, 142 S. Ct. at 665 ("Permitting OSHA to regulate the hazards of daily life . . . would significantly expand OSHA's regulatory authority . . . ."); *see also, e.g.*, *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; *King v. Burwell*, 576 U.S. 473 (2015); *Gonzales v. Oregon*, 546 U.S. 243 (2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). The Final Rule does not have any such "transformative" effect. It merely provides Treasury with the authority to oversee a one-time outlay of federal funds granted to the States.

For the same reason, the Governor is incorrect to suggest that the Final Rule "intrude[s] into areas that are the particular domain of state law." Compl. ¶ 83 (alterations and omissions omitted) (quoting *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489). Quite the opposite: *Congress* has a sovereign interest in conditioning the receipt of federal funds "on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 58 (2012); *see Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143 (1947) (explaining that Congress has the "power to fix the terms upon which its money allotments to [S]tates shall be disbursed"). And here, Congress not only provided its own conditions but unequivocally authorized the Secretary to set other conditions by "issu[ing] such regulations as

may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). So

the "major questions doctrine" does not apply.[7]

**B. The Governor's Spending Clause claim should be dismissed.**

The Governor next claims that the Final Rule violates the Spending Clause

of the Constitution because the underlying statute "is ambiguous in the strings it

attaches to the use of" Rescue Plan funds. Compl. ¶ 97. The Governor is wrong.

In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court de-

clared that "if Congress intends to impose a condition on the grant of federal mon-

eys, it must do so unambiguously." 451 U.S. 1, 17, 24 (1981). But that is not an

onerous requirement: Congress must provide only "clear notice to the States that

they, by accepting funds under the Act, would indeed be obligated to comply

with" certain conditions. *Id.* at 25. The idea is simply to keep Congress from "sur-

prising participating States with post-acceptance or retroactive conditions." *NFIB*,

567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25); *see City of Los Angeles v. Barr*,

929 F.3d 1163, 1174–75 (9th Cir. 2019).

When Congress makes clear that a State's acceptance of federal funds re-

quires agreement to certain conditions, it can leave further details for an agency

to explain by regulation. *Bennett*, 470 U.S. at 669–72. As the Ninth Circuit has ex-

plained, "Congress is not required to list every factual instance in which a [S]tate

will fail to comply with a condition," which would be potentially "impossible."

*Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see Bennett*, 470 U.S. at

666 (explaining that "every improper expenditure" need not be "specifically iden-

tified and proscribed" in the statute); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S.

---

[7] Even if the major questions doctrine does apply, it is satisfied because Congress did "speak clearly." It gave the Secretary the power to issue "necessary or appropriate" regulations, including for the purpose of "respond[ing] to the public health emergency." 42 U.S.C. § 802(c)(1), (f). This language clearly encompasses the authority to prohibit recipients from using federal funds in ways that unnecessarily prolong the pandemic.

167, 183 (2005) (same); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (same); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (similar). Congress must simply "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067; *see also Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (distinguishing statutes where it is "unclear [] whether the [S]tates incurred any obligations . . . by accepting federal funds"); *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) ("[T]he existence of the conditions [must be] clear, such that States have notice that compliance with the conditions is required." (citations omitted)). One court in this district recently held exactly that. *Arizona*, 550 F. Supp. 3d at 797.

Here, the statute appropriates Rescue Plan funds to alleviate the pandemic's harms and authorizes the Secretary to issue all "necessary or appropriate" regulations. *See supra* Section II.A.; 42 U.S.C. § 802(f). The Final Rule then sensibly explains that States may not use Rescue Plan funds in ways that disincentive compliance with public-health measures. This process of legislation and subsequent regulatory explication is nothing new and bears no infirmity. *See Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (noting that "Congress has authorized the Secretary [of Health and Human Services] to impose conditions on the receipt of Medicaid and Medicare funds that 'the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services'" (quoting 42 U. S. C. § 1395x(e)(9)); *see Bennett*, 470 U.S. at 669–72.

## C.   The Rescue Plan does not violate the nondelegation doctrine.

Finally, Plaintiffs contend that, if the Rescue Plan authorizes the Secretary to issue the Final Rule, then the Rescue Plan must be an unconstitutional delegation of legislative authority. Compl. ¶¶ 100–05. "[A] statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266–67 (9th Cir. 2021) (internal quotation marks omitted) (quoting *Gundy v. United*

*States*, 139 S. Ct. 2116, 2123 (2019)), *cert. denied*, 142 S. Ct. 813 (2022). "Under modern precedent, the intelligible principle test imposes 'an exceedingly modest limitation.'" *United States v. Motamedi*, No. 20-10364, 2022 WL 101951, at *1 (9th Cir. Jan. 11, 2022) (quoting *Melgar-Diaz*, 2 F.4th at 1266). This requirement is satisfied here. The statute gives the Secretary the authority to issue regulations that are "necessary or appropriate" to carry out the purpose of the Act, including "respond[ing] to the public health emergency." 42 U.S.C. § 802(c)(1), (f). The Supreme Court has previously upheld statutory authority directing agencies to protect the "public health" through regulations. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001). And even directives to regulate in the "public interest" have been found to articulate an intelligible principle. *Id.* (quoting *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225–26 (1943)). Given that the Rescue Plan provides even more guidance for the Secretary than the delegations upheld by the Supreme Court—authorizing the Secretary "to issue such regulations as may be necessary or appropriate *to carry out this section*"—the Rescue Plan does not run afoul of the nondelegation doctrine. 42 U.S.C. § 802(f) (emphasis added).

## CONCLUSION

The Court should dismiss the Complaint for lack of jurisdiction or failure to state a claim.

DATED: March 22, 2022                      Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Michael P. Clendenen*
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-0693
Email:  michael.p.clendenen@usdoj.gov

*Counsel for Defendants*